IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSEPH A. O'TOOLE,

  Plaintiff,

vs.              CIV. 99-1426 LH/RLP

NORTHROP GRUMMAN CORPORATION,

  Defendant.

## DEFENDANT'S REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

  Defendant requests that the Court enter the following findings of fact and conclusions of law upon the completion of the trial of this matter.

### REQUESTED FINDINGS OF FACT

  1.  Plaintiff Joseph O'Toole ("O'Toole") is an engineer who was hired as a full time employee of Grumman Aerospace Corporation (Grumman) in June, 1970. (O'Toole testimony.)

  2.  Over the course of his career with Grumman, O'Toole relocated four times. He moved to Oak Ridge, Tenn., then to Princeton, N.J., then to Bethpage, N.Y., then to San Diego, Cal. Each time, Grumman reimbursed O'Toole for some, if not all, of his relocation expenses pursuant to Grumman's applicable relocation policy. (O'Toole testimony.)

**Relocation to San Diego**

  3.  In 1993, O'Toole was "seconded," or "loaned" to the University of California for a project known as ITER. The project was located in San Diego. O'Toole and his family relocated to San Diego from Bethpage. (O'Toole testimony.) While working in San Diego, O'Toole remained a Grumman employee and was part of Grumman's Energy Systems



organization. O'Toole expected that his assignment in San Diego would last for four years. (O'Toole testimony.)

4.  Consistent with its current policy, Grumman reimbursed O'Toole for some of the expenses associated with his move to San Diego. (O'Toole testimony.) At the time, Grumman also estimated that O'Toole's expenses for returning from San Diego to Bethpage, at the end of the ITER project, would be approximately $59,309. (10/13/93 Cost Proposal, Ex B.)

5.  At the time he moved from Bethpage to San Diego, O'Toole understood that Grumman had a written policy for the reimbursement of relocation expenses. He believed that the Grumman written policy would apply to the reimbursement of expenses when he returned from San Diego. (O'Toole testimony.)

6.  The Grumman policy for relocation expenses that existed at the time O'Toole moved to San Diego provided that "*at the company's option*, the services of a relocation management company acting as a third party *may be* utilized with regard to the disposition of the employee's home." (1992 Domestic Field Assignment Policy ("FAP"), Ex. D, at 19.) (emphasis added.) There is no specific provision in the FAP for loss protection on the sale of a home. The FAP also provided that "[t]he Corporation reserves the right to . . . grant, withdraw, modify or limit any allowances . . ." (FAP, Ex D, at 1.)

7.  Prudential Relocation Services was a third party relocation management company that Grumman used to assist some employees with the sale of their home during relocation. Under the Prudential option, there were three appraisals of the employee's home. The three appraisals were averaged and Prudential bought the employee's home for the average price. The Prudential option was a buy out, not a loss protection guarantee. (Nettuno testimony.)

8. At the time he moved to San Diego, O'Toole was aware that it was Northrop Grumman's option whether to provide the services of a third party relocation service, such as Prudential. (O'Toole testimony.)

9. While O'Toole was working and living in San Diego, in late 1995, Grumman Aerospace Corporation was acquired by Northrop Corporation and became known as Northrop Grumman. The relocation expense reimbursement policy changed. Third party buy out agencies, such as Prudential, were no longer an option under the new Northrop Grumman relocation policy. (Nettuno testimony.)

### *Relocation to Los Alamos*

10. In December, 1995, it was determined that O'Toole's work on the ITER project in San Diego would no longer be funded by the U.S. Department of Energy. O'Toole's work in San Diego was scheduled to end in April, 1996. (O'Toole testimony.)

11. Northrop Grumman had no work available for O'Toole in Bethpage. (Ex. G, 4/30/96 "Understanding") O'Toole was notified that if he did not find other work within Northrop Grumman, he would likely be terminated. (O'Toole testimony.)

12. O'Toole found employment by transferring to Northrop Grumman Technical Services, which organization had work available in Los Alamos, N.M. The job with Technical Services paid O'Toole the same salary, but the fringe benefits were less generous. (O'Toole testimony.)

13. O'Toole moved to Los Alamos in May, 1996. (O'Toole testimony.)

14. While O'Toole was preparing to move to Los Alamos, and during the move, he exchanged memoranda with Northrop Grumman in an effort to negotiate an agreement to reimburse relocation expenses. In a memo dated April 5, 1996, Northrop Grumman

3

Employment Representative Rita Ponte notified O'Toole that when his assignment at ITER was over, there would be an agreement to reimburse relocation expenses. The agreement would include assistance with the sale of his San Diego home and assistance with the purchase of a home in his new location. However, the reimbursement would not exceed the limits of the FAP that was in effect at the time he relocated to San Diego. (Memo from Ponte to O'Toole of 4/5/96, Ex. F; FAP, Ex. D.)

15. O'Toole was aware, before he moved to Los Alamos, that Northrop Grumman was electing *not* to provide him a third party relocation service, such as Prudential, or a buy out option, or loss protection on his home. (O'Toole testimony.) Under the FAP, it was the Company's option not to provide these benefits. (FAP, Ex D at 19.)

16. O'Toole wrote memoranda to Northrop Grumman on April 30 and May 7 attempting to negotiate a different agreement for the reimbursement of his relocation expenses. (O'Toole testimony.)

17. On May 22, 1996, Northrop Grumman wrote a memorandum to O'Toole setting forth the Company's agreement to reimburse relocation expenses. (5/22/96 Relocation Agreement, Ex. K.) According to the May 22, 1996 Relocation Agreement, Northrop Grumman would reimburse O'Toole for expenses not to exceed $59,309. The Agreement also provided a Home Sale Plan for assistance in selling the San Diego home, instead of Prudential Relocation Services. The Home Sale Plan included reimbursement for certain expenses of sale, such as broker's commissions, escrow and legal fees. The Home Sale Plan also included a Home Advocacy Program, whereby a real estate consultant would assist the employee with aggressively marketing the home to be sold. The May 22, 1996 Relocation Agreement did not

4

provide for Prudential Relocation Services, a buy out option or loss protection for the San Diego home. (5/22/96 Relocation Agreement, Ex. K.)

18. The May 22, 1996 Relocation Agreement was consistent with the terms of the FAP. (Id.; FAP, Ex. D.)

19. O'Toole signed the May 22, 1996 Relocation Agreement indicating that he had read, understood and agreed to it, but he added a phrase to the Agreement attempting to modify it. O'Toole wrote that the terms of the Agreement also "included . . . my cover memorandum." (5/22/96 Relocation Agreement, Ex. K.) In the cover memorandum, dated May 31, 1996, O'Toole demanded that a "buy out option" be made part of the Relocation Agreement. (5/31/96 Cover Memo, Ex. L.) A buy out option would require that Northrop Grumman or some third party purchase O'Toole's San Diego home if O'Toole was unable to sell it on the market. (O'Toole testimony.)

20. O'Toole also attempted to modify the Relocation Agreement by demanding that his relocation benefits be limited only by his own expectations, and not by what is allowed in the applicable relocation policy. (5/31/96 Cover Memo, Ex. L.)

21. Northrop Grumman rejected O'Toole's attempts to modify the Relocation Agreement. In a response memorandum dated June 11, 1996, Northrop Grumman informed O'Toole that the Relocation Agreement did not include the terms of his "cover memorandum," that the relocation benefits would be limited by the applicable policy, and that a buy out option was not included. (Memo from Ponte to O'Toole of 6/11/96, Ex. M.) O'Toole read this and understood that his attempt to modify the Relocation Agreement had been rejected. (O'Toole testimony.) O'Toole made no written response to the June 11, 1996 Ponte Memo and made no further attempts to modify the Relocation Agreement in writing. (O'Toole testimony.)

22. In subsequent conversations between O'Toole and Tony Favale, a Northrop Grumman manager, Northrop Grumman agreed that reimbursement of O'Toole's relocation expenses should not be subject to a cap of $60,000. Otherwise, there were no further modifications of the May 22, 1996 Relocation Agreement. O'Toole and Favale specifically reiterated the agreement that relocation expenses would be limited by the FAP. (O'Toole testimony.)

23. The agreement to reimburse relocation expenses is found in the FAP and in Northrop Grumman's May 22, 1996 Relocation Agreement, with the modification that relocation expense reimbursement would not be limited to $59,309. Northrop Grumman's promise did not include Prudential Relocation Services, a "buy out option," or home sale loss protection.

24. At no time after Northrop acquired Grumman did anyone from Northrop Grumman specifically tell O'Toole that Prudential would be used for his relocation to Los Alamos. At no time after Northrop acquired Grumman did anyone from Northrop Grumman tell O'Toole that he would receive a buy out option or loss protection on the sale of his San Diego home. (O'Toole testimony.)

***Termination***

25. O'Toole was among many employees who separated from Northrop Grumman in April, 1997 when Northrop Grumman's contract with Los Alamos National Laboratory was terminated. The reasons for O'Toole's termination are unrelated to this lawsuit. Upon termination from Northrop Grumman, O'Toole was immediately employed by another LANL contractor doing the same work at the same pay and with the same benefits. (O'Toole testimony.) O'Toole remained in Los Alamos.

6

***Grievance***

26.   The Northrop Grumman Grievance Procedure provides, in pertinent part, as follows:

> [E]stablishing or changing business and personnel policies, practices, rules, and regulations are not grievable.
>
> . . . .
>
> If you are not satisfied with the Administrative Officer's decision, it may be appealed to the Management Appeals Committee by filing a Notice of Appeal. Your appeal must be presented to Employee Relations within five working days after receiving the Administrative Officer's decision.
>
> . . . .
>
> Decisions of the Management Appeals Committee may be appealed by the employee to arbitration if the grievance has been properly processed through the various steps of this procedure.... The appeal must be delivered to Employee Relations within five working days after the Committee's decision is received.
>
> . . . .
>
> Unless otherwise agreed to by Employee Relations, selection of the arbitrator must take place within 60 calendar days after the date of your appeal to arbitration, or your grievance will be considered closed.

(Northrop Grumman Grievance Procedure, Ex. AA.)

27.   Plaintiff first submitted a grievance in March 1997, shortly before he terminated from Northrop Grumman. His grievance went through several iterations and was re-submitted on March 28 or 29, 1998. (3/28/98 "Grievance," Ex. P.) O'Toole's demand for expense reimbursement was, in total, unreasonable. In his grievance, O'Toole claimed expense reimbursement in excess of $200,000 and included such items as payment for time spent moving, taxes on investment plan withdrawals, and costs not yet incurred such as attorney fees.

("Grievance" (Itemized), Ex. R.) Ultimately, O'Toole's grievance expanded to include claims for reimbursement exceeding $300,000. (O'Toole testimony; Itemized "Reimbursement" List, Ex. S.)

28. At the first level review of O'Toole's grievance, Northrop Grumman offered to resolve the case by paying some, but not all, of O'Toole's claimed expenses. (Memo from Nettuno to O'Toole of 5/4/98, Ex. T.) Northrop Grumman conceded that O'Toole was entitled to reimbursement for some of the claimed expenses and invited O'Toole to submit documentation of those expenses. Id. Other expenses were rejected because they were inconsistent with the FAP or were otherwise unreasonable. (Nettuno testimony.)

29. Upon receiving the May 4, 1998 memo, O'Toole called Mr. Nettuno and discussed it with him. (O'Toole testimony.) Nettuno told Plaintiff that Northrop Grumman was waiting to hear what Plaintiff wanted to do about his grievance, that Nettuno was being reassigned and that the grievance was being turned over to Louise Ussery, his replacement. (O'Toole testimony; Nettuno testimony.)

30. On Sept. 8, 1998, Plaintiff faxed a copy of Mr. Nettuno's May 4, 1998 response memo to Louise Ussery and invited Ms. Ussery to call him. (Fax from O'Toole to Ussery of 9/8/98, Ex. U.)

31. In September or October, 1998, O'Toole spoke to Ussery and was told that he would be paid those amounts conceded to be due in the May 4, 1998 Memorandum of Daniel Nettuno. However, to obtain reimbursement, he would have to agree to settle his entire grievance. (O'Toole testimony.) O'Toole chose not to do this. Northrop Grumman did not pay the amounts conceded to be due on May 4, 1998 until June 2001 when it settled parts of this litigation. Given O'Toole's unreasonable demand for expense reimbursement, it was not

unreasonable for Northrop Grumman to insist that O'Toole's grievance be resolved in its entirety, instead of piecemeal.

32. After speaking to Ussery, O'Toole took no further action to get reimbursed by Northrop Grumman. He did not request an appeal of his grievance, review by the Management Appeals Committee, or Arbitration. (O'Toole testimony.)

## *Damages Claims*

33. Northrop Grumman paid some of O'Toole's relocation expenses in May, June and October of 1996, as they were incurred. Other claims for reimbursement were paid in a settlement agreement reached between the parties in June 2001. (O'Toole testimony.) The claims for expense reimbursement remaining as of the date of trial are as follows:

## *Loss on Sale of Home*

34. O'Toole sold his San Diego home at a loss of $21,500. (O'Toole testimony.) However, there was never any agreement by Northrop Grumman to provide loss protection for the sale of the home. (O'Toole testimony.) O'Toole's San Diego home sold in September 1996 for its market value at the time. O'Toole suffered a loss on the sale of his San Diego home because of the condition of the local housing market, and not because of any failure by Northrop Grumman to meet its obligations to reimburse relocation expenses. (O'Toole testimony.) This loss was incurred in September, 1996 and is unrelated to Northrop Grumman's failure to pay the amounts it conceded to be due in May 1998.

## *Moving Expenses Between Rental Houses.*

35. O'Toole moved from his first rental house in Los Alamos to a second rental house in Los Alamos in July 1997. O'Toole moved from the second rental house to a third rental house

in May 1998. O'Toole moved from the third rental house to a house that he purchased in Los Alamos in September 1998. (O'Toole testimony.)

36. O'Toole was reimbursed for the expense of moving his household goods from the third rental house to the house he purchased in Los Alamos. O'Toole sought reimbursement for the expense of moving his household goods twice before in July 1997 and in May, 1998. (O'Toole testimony.)

37. Northrop Grumman never made a promise to pay for the first two interim moves. (O'Toole testimony.) The moves were made at O'Toole's discretion and not because of any failure by Northrop Grumman to meet its obligations to reimburse relocation expenses. (O'Toole testimony.) These moves, and therefore these expenses, are unrelated to Northrop Grumman's failure to pay the amounts it conceded to be due in May, 1998.

***Time Spent Moving***

38. Rather than hiring a moving company to move his personal belongings between the rental houses, and to the house he purchased in September 1998, O'Toole and his family moved their belongings themselves. O'Toole sought three week's pay at his regular salary as reimbursement for the time he spent moving. (O'Toole testimony.)

39. At the time he moved from the first rental house in Los Alamos to the second, O'Toole was on Northrop Grumman salary. He was therefore paid for his time. (O'Toole testimony.) His claim to be paid time for that move was false.

40. The second and third moves were caused by O'Toole's unilateral decisions and not because of any failure by Northrop Grumman to meet its obligations to reimburse relocation expenses. (O'Toole testimony.) Northrop Grumman never made a promise to pay for any time spent by the employee moving personal belongings. These moves, and therefore these expenses,

are unrelated to Northrop Grumman's failure to pay the amounts it conceded to be due in May 1998.

### Lump Sum over $1,000 Miscellaneous Allowance

41. The FAP provided for an allowance of $1,000 for miscellaneous expenses. It also provided for reimbursement of miscellaneous expenses greater than $1,000 if "reasonable," "actual" and "receipted." (FAP, Ex. D, at 18.) Whether actual receipted expenses over $1,000 are reasonable and therefore reimbursable is within the company's discretion. (O'Toole testimony.)

42. O'Toole submitted a claim for $4,000 under this provision of the FAP. However, O'Toole had no actual receipted expenses in this amount. He based this claim on an "average" of miscellaneous expenses he incurred in a move from Princeton to Bethpage, many years earlier. (O'Toole testimony.)

43. Northrop Grumman made no promise to pay O'Toole $4,000 in miscellaneous expenses. This claim does not qualify for reimbursement under the FAP because O'Toole had no actual receipted expenses. (FAP, Ex. D, at 18.)

44. These alleged expenses are unrelated to Northrop Grumman's failure to pay the amounts it conceded to be due in May 1998.

### Expenses Associated with Investment Plan Withdrawals

45. O'Toole made a $19,000 withdrawal from his investment plan and, later, made a $45,758 withdrawal from his investment plan. Taxes on the first withdrawal are claimed to be $9,405. Taxes, interest and penalties on the second withdrawal are claimed to be $23,683. (Itemized "Reimbursement", Ex. S.)

46.     O'Toole submitted a claim for reimbursement of the taxes, interest and penalties. ("Grievance" (Itemized), Ex. R.)  Northrop Grumman denied the claim on the grounds that the decision to withdraw funds from his investment plan was O'Toole's. (Memo from Nettuno to O'Toole of 5/4/98, Ex. T.)  O'Toole also sought reimbursement of the earnings lost due to withdrawals from his investment plan. (Itemized "Reimbursement," Ex. S.)

47.     Northrop Grumman made no promise to reimburse taxes, interest, penalties or lost earnings due to withdrawal of investment funds.  O'Toole made the decisions to withdraw funds, and the decisions were not necessitated by any failure by Northrop Grumman to meet its obligations to reimburse relocation expenses.  (O'Toole testimony.)  These claimed losses were unrelated to Northrop Grumman's failure to pay the amounts it conceded to be due in May 1998.

48.     O'Toole cannot establish that the proceeds of the withdrawals were used exclusively for relocation expenses.  (O'Toole testimony.)

***Lost Mortgage Interest Deduction***

49.     Because he lived in rental houses for over two years after arriving in Los Alamos, O'Toole lost a potential mortgage interest deduction from his state and federal income taxes.  He estimates this loss at $13,140. (O'Toole testimony; "Grievance" (Itemized), Ex. R.)

50.     O'Toole submitted a claim for reimbursement of the lost mortgage interest deduction ("Grievance" (Itemized), Ex. R), and the claim was denied by Northrop Grumman. (Memo from Nettuno to O'Toole of 5/4/98, Ex. T.)

51.     Northrop Grumman made no promise to reimburse O'Toole for the loss of a potential mortgage interest deduction.  O'Toole made the decision not to buy a home in Los Alamos for over two years.  This delay in a home purchase was not caused by any failure of Northrop Grumman to meet its obligations to reimburse relocation expenses.  (O'Toole

testimony.) The delay in the home purchase was not related in any way to Northrop Grumman's failure to pay the amounts it conceded to be due in May 1998.

### *Mortgage Principal Payments*

52.     Because he lived in rental houses for over 2 years after arriving in Los Alamos, O'Toole did not make monthly payments toward equity in a home during that period. He estimates this loss at $4,800. (O'Toole testimony; "Grievance" (Itemized), Ex. R.)

53.     O'Toole submitted a claim for reimbursement of lost mortgage principal payments (Ex R "Grievance" (Itemized), Ex. R), and Northrop Grumman denied the claim. (Memo from Nettuno to O'Toole of 5/4/98, Ex. T.)

54.     Northrop Grumman made no promise to reimburse O'Toole for unpaid mortgage principal payments. O'Toole made the decision not to buy a home in Los Alamos for over two years. This delay in the purchase of a home was not caused by any failure of Northrop Grumman to meet its obligations to reimburse relocation expenses. The delay in buying a home was unrelated to Northrop Grumman's failure to pay the amounts it conceded to be due in May, 1998. (O'Toole testimony.)

### *Cost of Los Alamos Housing Upgrade*

55.     After over two years in the community, O'Toole purchased a home in Los Alamos. He would now prefer to purchase a larger or better home in Los Alamos worth $265,000, the same value he placed on his San Diego home. O'Toole claims as damages the closing costs associated with the potential sale of his current Los Alamos home and the closing costs associated with the potential purchase of a new, larger home. These costs have not actually been incurred. O'Toole estimates the closing costs of sale to be $37,100 and the closing costs of purchase to be $11,700. (Itemized "Reimbursement," Ex. S.)

56. Northrop Grumman made no promise to reimburse O'Toole for these expenses. O'Toole made the decision regarding which home to purchase in Los Alamos. He was not forced to buy the particular home he chose and his choice was not caused by any failure by Northrop Grumman to meet its obligations to reimburse relocation expenses. (O'Toole testimony.) These claimed losses are not related in any way to Northrop Grumman's failure to pay the amounts it conceded to be due in May 1998.

***Attorney Fees***

57. Northrop Grumman never made O'Toole any promise to pay attorney fees. (O'Toole testimony.)

***Payments***

58. As of October 18, 1996, O'Toole received reimbursement for relocation expenses in the amount of $19,202. To date, O'Toole has received a total reimbursement of relocation expenses in the amount of $66,702. (O'Toole testimony.)

## CONCLUSIONS OF LAW

59. New York law controls resolution of the contract issues. O'Toole v. Northrop Grumman Corp., 305 F.3d 1222, 1225 (10th Cir. 2002).

60. In order for a promise to be legally enforceable, there must be an offer, an acceptance, consideration and mutual assent. Camrex Contractors (Marine) Ltd. v. Reliance Marine Applicators, 579 F. Supp. 1420, 1430 (E.D.N.Y. 1984) (applying New York law) (citing 17 Am. Jur. 2d Contracts § 10 (Supp. 1983)).

61. Northrop Grumman never made an offer to pay the expenses O'Toole claims at trial.

14

62. For there to be mutual assent, the parties must have had the same understanding of the material terms of the agreement, or a "meeting of the minds." Int'l Paper Co. v. Suwyn, 966 F. Supp. 246, 254 (S.D.N.Y. 1997) (citing Brands v. Urban, 587 N.Y.S.2d 698, 700 (App. Div. 1992); May v. Wilcox, 582 N.Y.S.2d 294, 294 (App. Div. 1992)).

63. Northrop Grumman never assented to paying the expenses O'Toole claims at trial.

64. The parties to an agreement may modify the terms of the existing agreement. Oil Trading Assocs. v. Texas City Refining, Inc., 201 F. Supp. 846, 852 (S.D.N.Y. 1962) (applying New York law). In order for a modification of a contract to be effective, there must be mutual assent to the modification. Id.

65. Northrop Grumman's promise to pay relocation expenses is found in the 1992 FAP and in the May 22, 1996 Relocation Agreement. The May 22 1996 Relocation Agreement was modified to the extent that a $59,309 cap was no longer imposed. Northrop Grumman never assented to any other modification of the May 22, 1996 Relocation Agreement. The agreement between the parties did not include Prudential Relocation Services, a "buy out option," or home sale loss protection.

66. Neither the FAP nor the May 22, 1996 Relocation Agreement obligated Grumman to pay the expenses O'Toole claimed at trial. Northrop Grumman has not breached its agreement to pay relocation expenses.

67. If a party fails to perform a contractual obligation when that performance is called for, there is a breach of contract. See New York State Elec. & Gas Corp. v. State, 630 N.Y.S.2d 412, 414 (App. Div. 1995).

68. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made. It is necessary that loss from a breach is foreseeable and probable. Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1010 (N.Y. 1993).

69. "However, the law does not permit the injured party to recover damages for losses that could have been avoided by taking reasonable and appropriate steps." Inchaustegui v. 666 5th Ave. Ltd. P'ship, 706 N.Y.S. 2d 396, 399 (App. Div. 2000), aff'd 749 N.E.2d 196 (N.Y. 2001).

70. None of the expenses O'Toole claimed at trial were caused by Northrop Grumman's failure to pay any relocation expenses that were due. Insofar as O'Toole's damages arose out of any failure of Northrop Grumman to perform under its agreement to pay relocation expenses, those damages were unforeseeable.

71. Punitive damages are not recoverable for breach of contract. Egan v. N.Y. Care Plus Ins. Co., 716 N.Y.S.2d 430, 432 (App. Div. 2000); Meinrath v. Singer Co., 482 F. Supp. 457, 461 (S.D.N.Y. 1979) (citing, inter alia, M.S.R. Assocs., Ltd. v. Consol. Mut. Ins. Co., 396 N.Y.S.2d 684 (App. Div. 1977)), aff'd Mem., 697 F.2d 293 (2 Cir. 1982), except in "those limited circumstances where necessary to deter defendant and others like it from engaging in conduct that may be characterized as "gross" and "morally reprehensible," and of "'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" N.Y. Univ. v. Cont'l Ins. Co., 662 N.E.2d 763, 767 (N.Y. 1995) (quoting Rocanova v. Equitable Life Assurance Soc'y, 634 N.E.2d 940, 943-44 (N.Y. 1994)).

72. To establish entitlement to punitive damages under the exception to the general rule barring such damages for breach of contract, "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in Walker

v. Sheldon, . . . 179 N.E.2d [at 499] . . . (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." Id. (citing Rocanova).

73. For a defendant's conduct to be actionable as an independent tort, for purposes of considering punitive damages in a breach of contract case, the defendant must (for example) fraudulently induce Plaintiff to enter into the contract or engage "in conduct outside the contract but intended to defeat the contract." N.Y. Univ., 662 N.E.2d at 768. "Conversely, where a party is merely seeking to enforce its bargain, a tort claim will not lie." Id.

74. The use of familiar tort language--including allegations that the defendant breached the implied covenant of good faith and fair dealing--in a complaint for breach of contract does not enable the plaintiff to pursue punitive damages. N.Y. Univ., 662 N.E.2d at 770.

75. Plaintiff contends that he is entitled to punitive damages based on Defendant's refusal to compensate him under the contract, which refusal was due in part to Defendant's disagreement with Plaintiff as to the amount owed under the contract. Neither these allegations, nor the facts in support proven at trial rise to the level of an independent tort. N.Y. Univ., 662 N.E.2d at 767.

76. Tortious conduct egregious enough to support a punitive damages claim in a breach of contract action must illustrate "a 'high degree of moral turpitude' and . . . 'such wanton dishonesty as to imply a criminal indifference to all civil obligations.'" Rocanova, 634 N.E.2d at 943-44 (quoting Walker, 179 N.E.2d at 499). Neither Plaintiff's allegations in support of his punitive damages claim nor the facts presented at trial demonstrate moral turpitude or wanton dishonesty.

77. A pattern of misconduct directed at the general public and sufficient to support a claim for punitive damages for breach of contract involves situations such as where the defendant is alleged and proven to have used "false and fraudulent representations" to induce the public to enter into contracts, or where the defendant "deliberately and cooly engage[d] in a far-flung fraudulent scheme, systematically conducted for profit." Walker, 488 N.Y.S.2d at 499. Neither Plaintiff's allegations in support of his punitive damages claim nor the facts presented at trial rise to this level.

78. Attorney fees are not recoverable in the absence of a statute, a court rule or a specific agreement between the parties to pay attorney fees. Hooper Associates, Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 904 (N.Y. 1989). There is no agreement, court rule or statute providing for O'Toole's attorney fees and they are not recoverable in this action.

Respectfully submitted,

**RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.**

By _/s/ Scott D. Gordon_
Scott D. Gordon
Attorneys for Defendant
Post Office Box 1888
Albuquerque, NM 87103
(505) 765-5900

### CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing Defendant's Requested Findings of Fact and Conclusions of Law, was hand-delivered to Alexander A. Wold, Jr., Alexander Wold & Associates, P.C., 302 Silver, S.E., Albuquerque, NM on this 11th day of March 2003.

_/s/ Scott D. Gordon_
Scott D. Gordon