IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 20 2003

CLERK

JOSEPH O'TOOLE,

    Plaintiff,

v.

NORTHROP GRUMMAN CORP.,

    Defendant.

CIV 99-1426

MEMORANDUM OPINION

    This matter came before the Court for trial on May 19, 2003. Evidence was adduced by both plaintiff and defendant, and after closing arguments, the case was submitted on May 21, 2003. The Court has reviewed the evidence, the arguments of counsel, the parties' briefs and proposed findings of fact and conclusions of law and now makes the following findings of facts and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**CLAIMS OF THE PARTIES**

    This action arises from a dispute between the parties regarding the proper amount of money Northrop Grumman Corp. owes Joseph O'Toole in connection with costs associated with his relocation from San Diego, California, to Los Alamos, New Mexico.

    O'Toole claims that Northrop Grumman breached its contract with him by refusing to pay him for various relocation expenses associated with his move from San Diego, California, to Los Alamos, New Mexico. Northrop Grumman contends that it paid O'Toole everything to which he is entitled.



**BACKGROUND**

The plaintiff, Joseph O'Toole, is an engineer who began working for Grumman Aerospace Corporation ("Grumman") in June, 1970. In 1993, O'Toole was working for Grumman in Bethphage, New York, when Grumman "seconded" him to the University of California for a project in San Diego, California. As a result of the secondment agreement, O'Toole and his family relocated to San Diego in 1993. O'Toole received various benefits with the relocation, including the use of a relocation management company, Prudential Relocation Services, and reimbursement for various moving expenses. The policies governing the application of these benefits were outlined in two documents containing Grumman's domestic field assignment policies. See Ex. 12.7, 12.8. At the time of the move to San Diego, Grumman estimated that it would cost approximately $59,309 for O'Toole and his family to relocate back to Bethphage at the end of the secondment.

In 1995, while O'Toole was still in San Diego, Grumman was acquired by Northrop Corporation and became known as Northrop Grumman. At that time, the relocation expense reimbursement policy changed.[1] Shortly thereafter, the project in San Diego ended and O'Toole needed to relocate again. He chose to relocate

---

[1] As is evident in the discussion below, the result in this case is the same regardless of whether the Court chooses to apply the old policy (Grumman), the new policy (Northrop Grumman), or both.

to Los Alamos, New Mexico, where he found employment with Northrop Grumman's Technical Services group. In May, 1996, O'Toole moved to Los Alamos.

While O'Toole was preparing to move to Los Alamos, he corresponded with several company officials regarding the reimbursement of relocation expenses. The parties exchanged various writings in an attempt to re-negotiate the relocation reimbursement policy, but the parties failed to agree on the proposed changes. Before O'Toole moved to Los Alamos, he notified Northrop Grumman that he planned to rent a house in Los Alamos rather than purchase one. *See* Ex. 12.10 at 1. O'Toole intended to rent for one year so that he could then determine if Northrop Grumman would receive the "APT contract." If Northrop Grumman received the contract, O'Toole would buy a house because the contract would require that he remain in Los Alamos for an extended period of time.

When O'Toole moved to Los Alamos in May, Northrop Grumman agreed to reimburse him for certain expenses associated with the relocation and refused to compensate him for other of his claimed expenses. As a result, O'Toole withdrew money from his Savings and Investment Plan ("SIP") to cover those latter expenses. O'Toole incurred various taxes and penalties for making those withdrawals, and he also incurred other expenses

that he now claims Northrop Grumman owes him pursuant to the company's relocation policies.

The parties resolved certain of plaintiff's claims in a settlement reached in the summer of 2001. Pursuant to the settlement agreement, the plaintiff and his attorney received $47,500 "in full satisfaction and settlement of all claims for (1) duplicate housing costs; (2) un-reimbursed moving expenses and/or closing costs on sale of San Diego house; (3) Los Alamos house purchase expenses; (4) expenses for moving from Los Alamos rental property into Los Alamos purchased home; (5) 'incorrect' prior gross up; (6) gross up on items 1 through 4; (7) costs incurred by both parties to date; (8) prejudgment interest on these Settled Claims; and (9) gross up on all relocation expenses already paid by Northrop Grumman to O'Toole (items 1-9 referred to collectively as 'Settled Claims.'" (Ex. W at 2.)

For an additional discussion of the background of this case, see *O'Toole v. Northrop Grumman Corp.*, 305 F.3d 1222, 1223-25 (10th Cir. 2002).

**DISCUSSION**

Joseph O'Toole alleges that Northrop Grumman breached the contract by failing to pay various costs associated with O'Toole's relocation from San Diego to Los Alamos. Specifically, O'Toole claims that Northrop Grumman failed to provide the services of Prudential Relocation Services; failed to provide an

interest-free bridge loan; failed to reimburse him for duplicate housing costs; failed to pay for his time involved in moving from one rental house to another; failed to compensate him for moving expenses and consequential damages resulting from these alleged breaches of contract.

    A.    Prudential Relocation Services

At trial, O'Toole argued that Northrop Grumman was required to provide him with the services of Prudential Relocation Services ("Prudential") to assist him with the sale of his home in San Diego. Prudential is a company that assists sellers with the process of selling their home by structuring the transaction such that the seller does not incur any tax liability for the sale. The company opted to provide Prudential's services to O'Toole when he sold his house in Bethphage, New York, and moved to San Diego, but it did not offer Prudential's services to O'Toole when he sold his house in San Diego.

The defendant's relocation policy contains language that specifically addresses whether it must provide relocation services, such as Prudential. The contract states: "*At the company's option*, the services of a relocation management company acting as a third party may be utilized with regard to the disposition of the employee's home. For information regarding procedures governing use of a third party agency, contact Field Administration, Corporate Operations." Plaintiff's Ex. 12.7, at

19 (emphasis added). The contract also provides that, if the company does not exercise this option, other policies would apply. *See id.* at 19-20.

O'Toole argues that when Grumman chose to provide Prudential's services to him for his move from Bethphage to San Diego, it exercised the option and was required to provide the same services for his subsequent move from San Diego to Los Alamos. The plain language of the contract does not support such a contention. Rather, when O'Toole began his move from San Diego to Los Alamos, the defendant had the option to use a relocation management company, such as Prudential, or to offer the alternative benefits listed in the contract. It is clear from the testimony adduced at trial, as well as the accompanying exhibits, that Northrop Grumman declined to exercise the option of using a relocation management company, and instead chose to offer the alternate benefits as listed in the policy.

Specifically, the contract states that if the company declines to exercise its option of using a relocation management company:

> "Employees intending to sell their
> [San Diego]² houses shall have one

---

² Section 1(C) of Grumman's personnel policy provides: "Long Island is used as a general point of reference in this policy. However, the policy applies to employees who undertake a Field Assignment regardless of their initial place of assignment. The policy also applies to the return from the field unless specifically indicated otherwise." Ex. D at 1.

> (1) month from their notification
> of assignment to offer their houses
> for sale at whatever price and
> terms they deem reasonable, without
> jeopardizing the assistance
> described below. If, at the end of
> the one (1) month period, the
> employee does not have a contract
> of sale, the continuation of
> assistance will be contingent upon
> the house being vacant (if the
> employee has relocated by that
> time), in salable condition, and
> offered for sale at an amount not
> to exceed 5% above the appraised
> market value . . . ."

Ex. 12.7, at 19. The contract then provides that the employee may receive reimbursement of various fees related to the sale of the house, including reimbursement of legal fees "not to exceed 1% of the sales price," reimbursement of closing costs "normally not to exceed 2% of the sales price," reimbursement of real estate advertising costs "not to exceed $150.00," as well as possible reimbursement for a mortgage pre-payment penalty, mortgage points, vandalism insurance, realtor's fee, and duplicate housing payments. *Id.* at 20.

Northrop Grumman was within its right to decline to provide O'Toole with the services of Prudential Relocation Services for the sale of his San Diego house, as the company followed the procedures contained in the contract. The contract does not require, as O'Toole alleges, that Northrop Grumman must provide Prudential's services for the move from San Diego simply because it provided Prudential when O'Toole moved from Bethphage.

-7-

O'Toole argues that this provision is ambiguous and it is unclear whether the option carries over to the subsequent move; as such, O'Toole contends that the ambiguity should be resolved against the defendant, the drafter of the contract. This argument fails as the Court finds that this provision of the contract is not ambiguous. It is clear that the defendant had the option of whether to provide a relocation management company -- and nothing in the contract suggests that the defendant's exercise of such option for one move required it to exercise the option for any subsequent moves. As such, the plaintiff's claim that the defendant breached the contract by refusing to provide Prudential will be denied.

    B.    Interest-Free Bridge Loan

The plaintiff also claims that the defendant breached the contract by refusing to provide him with an interest-free bridge loan so that he could purchase a house in Los Alamos while his San Diego home was for sale. The plaintiff relies on the following contract provision:

> An employee selling a house in [San Diego][3] who has not gone to closing on the sale *prior to closing on a house in the field,* may be granted an interest-free bridge loan for a period not to exceed one (1) year. The amount of the loan normally will be limited to the minimum amount necessary for a down payment

---

[3] See Footnote 2.

> for the purchase of comparable
> housing. The loan must be secured
> by a subordinate mortgage on the
> [San Diego] home and repaid
> promptly upon the closing of the
> [San Diego] home."

*Id.* at 21 (emphasis added).

Under the circumstances of this case, Northrop Grumman was under no obligation to provide Mr. O'Toole with an interest-free bridge loan. First, and most importantly, O'Toole never closed on a house in the field while he was employed by Northrop Grumman. Rather, he rented a house upon his move to Los Alamos. In fact, O'Toole rented three different houses before he purchased a home in Los Alamos, at which time he was no longer employed by the defendant (and no longer entitled to any benefits under the contract). O'Toole's own memoranda to various company officials indicate that he had no intention to purchase a house immediately upon his relocation; rather, he planned to wait for one year to see if the company would receive the APT contract that would make his Los Alamos job a permanent one. Rita Ponte testified at trial that the plaintiff never requested an interest-free bridge loan at the time of his move from San Diego to Los Alamos. The Court finds Ponte's testimony to be credible and further finds that O'Toole was not entitled to the loan because he never requested it. This is corroborated by the plaintiff's own memoranda, in which he references his intent to rent for the first year in Los Alamos. Ex. 12.10 at 1.

The plaintiff argued at trial that he could not close on a house in Los Alamos because the defendant's employees indicated that the company would not provide the bridge loan. The Court does not find this testimony credible. Again, the defendant's own writings state that he did not intend to purchase a house upon his relocation to Los Alamos. The company was therefore not obligated to provide assistance in the form of an interest-free bridge loan. The plaintiff's claim regarding the bridge loan will be denied.

C.  Duplicate Housing Costs

The plaintiff further argues that Northrop Grumman breached the contract by refusing to reimburse him for duplicate housing costs incurred during his relocation to Los Alamos. Company policy provided that, if the company did not provide the employee with a relocation management company, "the employee will be reimbursed for duplicate housing costs, if any." *Id.* at 20. Although the testimony and evidence established that Northrop Grumman likely failed to properly pay some of these expenses, the company no longer has an obligation to reimburse the plaintiff for any duplicate housing payments. In 2001, the parties entered into a settlement agreement whereby the defendant paid O'Toole and his attorney $47,500 "in full satisfaction and settlement of all claims for (1) duplicate housing costs . . . ." Ex. W at 2. Accordingly, the settlement agreement extinguished the

plaintiff's right to make a claim for any expenses associated with duplicate housing costs.

D.   Other Damage Claims

In addition to the damages suffered as a direct result of the above breaches, the plaintiff contends that he suffered various other consequential damages that the parties should reasonably have foreseen at the time they entered the contract. For example, the plaintiff seeks to be compensated for lost earnings on his Savings and Investment Plan ("SIP"); taxes paid on withdrawals from the SIP; out-of-pocket expenses associated with moving from one rental house to another in Los Alamos (twice); for his time spent in moving from one rental to another in Los Alamos; punitive damages; and other various expenses. Because the plaintiff has failed to identify a provision of the contract that the defendant breached, the plaintiff is clearly not entitled to any of these consequential damages.

The plaintiff is also not entitled to punitive damages. In the absence of a breach of contract, punitive damages are inappropriate. Even assuming, *arguendo*, that the plaintiff had proven a breach in this case, it is unlikely that such a breach would have satisfied the standard for awarding punitive damages in a breach of contract case. *See New York University v. Continental Ins. Co.*, 662 N.E.2d 763 (N.Y.Ct.App. 1995) (outlining the instances when punitive damages may be awarded in

-11-

contract cases). Accordingly, the Court declines to award punitive damages.

## CONCLUSION

Based on the Court's examination of the testimony, exhibits, and applicable law, judgment will be entered for the defendant Northrop Grumman Corporation. A separate order will be entered in accordance with this memorandum opinion.

DATED this 18th day of June, 2003.

BY THE COURT:

/s/ Lyle E. Strom

LYLE E. STROM, Senior Judge
United States District Court