FILED
IN THE UNITED STATES DISTRICT COURT FOR THE CT COURT
DISTRICT OF NEW MEXICO
DISTRICT OF NEW MEXICO
05 MAY 23 AM 11:09

CLERK ALBUQUERQUE

| | |
|---|---|
| JOSEPH O'TOOLE, | |
| Plaintiff, | CIV 99-1426 LH/RLP |
| v. | |
| NORTHROP GRUMMAN CORP., | MEMORANDUM OPINION |
| Defendant. | |

This matter is before the Court on remand from the United States Court of Appeals for the Tenth Circuit directing the Court to enter "an award of consequential damages that includes at least an amount reimbursing the penalties paid and interest lost on the funds Mr. O'Toole was forced to withdraw from his retirement account to pay for the undisputed relocation costs." The Court of Appeals further directed the Court to "consider all other claims for consequential damages and make specific findings as to each claim." The background for addressing these issues is the partial settlement agreement and release (Exhibit W) dated June 29, 2001, entered into by the parties. That settlement agreement excluded the following items which the parties characterized as constituting "Consequential Damages:"

> 1) The difference between purchase and sale price of San Diego home;
>
> 2) Costs of moving from the first rental home in Los Alamos to two other rental homes;



> 3) Payment for time spent moving from second rental home in Los Alamos and from third home to fourth;
>
> 4) Payment of lump sum above the $1,000 average allowance for miscellaneous relocation expenses;
>
> 5) Reimbursement for all taxes, penalties and interest on withdrawals from employee investment plan;
>
> 6) Payment for additional taxes paid because of unavailability of mortgage interest deduction;
>
> 7) Payment for lost equity in a home;
>
> 8) Payment at 14% for the cost of selling current Los Alamos home to purchase the size of a home that O'Toole contends would have been purchased if the relocation was handled differently;
>
> 9) Payment of standard amount of 5% as reimbursement for costs of purchasing second home in Los Alamos;
>
> 10) Lot earnings from employee investment fund due to withdrawals.

In addition, the partial settlement agreement and release contains the following three items which are outside the claimed "Consequential Damages:"

> 11) Damages associated with defendant's failure to recall O'Toole;

>   12) Damages associated with the
>   defendant not following its
>   grievance procedure;
>
>   13) Gross up on consequential
>   damages; and
>
>   14) Punitive damages.

Items 1 and 14 were resolved by the opinion of the Court of Appeals, finding that plaintiff was not entitled to recover the difference between the purchase and sale price of the San Diego home, nor was he entitled to the recovery of punitive damages.

The Court has reviewed the transcript of the trial, the briefs submitted by the parties at trial, the exhibits and the briefs submitted by the parties setting forth their respective positions on the damage issues remaining in this case.

**BACKGROUND**

The plaintiff, Joseph O'Toole, is an engineer who began working for Grumman Aerospace Corporation ("Grumman") in June, 1970. In 1993, O'Toole was working for Grumman in Bethphage, New York, when Grumman "seconded" him to the University of California for a project in San Diego, California. As a result of the secondment agreement, O'Toole and his family relocated to San Diego in 1993. O'Toole received various benefits with the relocation, including the use of a relocation management company, Prudential Relocation Services, and reimbursement for various moving expenses. The policies governing the application of these

benefits were outlined in two documents containing Grumman's domestic field assignment policies. See Ex. 12.7, 12.8.

In 1995, while O'Toole was still in San Diego, Grumman was acquired by Northrop Corporation and became known as Northrop Grumman. Shortly thereafter, plaintiff's secondment to San Diego ended, and O'Toole was advised that there was no job in Bethpage to which he could return. Northrop Grumman made arrangements for plaintiff to be employed by another division of defendant at Los Alamos, New Mexico. This position was somewhat temporary as it's continuance depended on defendant receiving the APT contract in the Spring or Summer of 1997 (Exhibit 12-13). In May, 1996, O'Toole moved to Los Alamos.

While O'Toole was preparing to move to Los Alamos, he corresponded with several company officials regarding the reimbursement of relocation expenses. The parties exchanged various writings in an attempt to re-negotiate the relocation reimbursement policy, but the parties failed to agree on the proposed changes. Before O'Toole moved to Los Alamos, he notified Northrop Grumman that he planned to rent a house in Los Alamos rather than purchase one. (See Ex. 12.13.) If Northrop Grumman received the "APT contract," O'Toole would buy a house since his employment would then be for an extended period of time. Thus, he moved into a rental house on July 4, 1996. Northrop Grumman did not receive the APT contract and as a

result, his employment with them ended on about May 1, 1997. He was then employed by the Los Alamos National Laboratories for about a year and since has been employed by W.A. Technical Services, Inc., in Los Alamos, New Mexico.

He moved to his second rental home in September, 1997, and to his third rental house in May, 1998, and finally bought a house in Los Alamos and moved in during September 1998.

Northrop Grumman had agreed that it owed plaintiff for certain expenses associated with his relocation to Los Alamos, but insisted on resolving other claimed expenses before paying him for those the parties had agreed would be paid to plaintiff. As a result, O'Toole withdrew money from his Savings and Investment Plan ("SIP") to cover those expenses. O'Toole incurred various taxes and penalties for making those withdrawals, and he also incurred other expenses that he now claims Northrop Grumman owes him pursuant to the company's relocation policies.

The parties resolved certain of plaintiff's claims in a settlement reached in the summer of 2001. Pursuant to the settlement agreement, the plaintiff and his attorney received $47,500 "in full satisfaction and settlement of all claims for (1) duplicate housing costs; (2) un-reimbursed moving expenses and/or closing costs on sale of San Diego house; (3) Los Alamos house purchase expenses; (4) expenses for moving from Los Alamos

rental property into Los Alamos purchased home; (5) 'incorrect' prior gross up; (6) gross up on items 1 through 4; (7) costs incurred by both parties to date; (8) prejudgment interest on these Settled Claims; and (9) gross up on all relocation expenses already paid by Northrop Grumman to O'Toole (items 1-9 referred to collectively as 'Settled Claims.'" (Ex. W at 2.)

For an additional discussion of the background of this case, see *O'Toole v. Northrop Grumman Corp.*, 305 F.3d 1222, 1223-25 (10th Cir. 2002).

## APPLICABLE LAW

The legal principles which are applicable to resolution of these consequential damage claims is the same for both New York and New Mexico. Each state requires proof of the existence of the damage as well as evidence from which the amount of the damages can reasonably be determined. For example, in *ESPN, Inc. v. Office of the Commissioner of Baseball*, 76 F.Supp. 416, 418 (S.D.N.Y. 1999), the Court stated:

> It is well settled under New York law that a plaintiff seeking compensatory damages has the burden of proof and should present to the Court a proper basis for ascertaining the damages [plaintiff] seeks to recover. They must be susceptible of ascertainment in some manner other than by mere conjecture or guess work.

In New Mexico, the New Mexico Supreme Court stated:

> It is a basic tenant of contract law however, that a party suing for specific damages has both the burden of proving the existence of injuries and the burden of proving damages with reasonable certainty so that the determination of the amount of damages by a judge or jury will not be based on speculation or conjecture.

*Mitchell v. Lovato*, 97 N.M. 425, 640 P.2d 925, 927 (1982). With these principles in mind, the Court will now address the claims of the plaintiff for consequential damages.

>  Damages Related to Early Withdrawal
>  of Funds from Savings Investment
>  Plan

The Tenth Circuit has directed the Court to award consequential damages which include at least an amount reimbursing the penalties paid and interest lost on the funds which the plaintiff was forced to withdraw from his retirement account to pay for undisputed relocation costs. The undisputed relocation costs amount to $26,230. In the pretrial order filed by the parties on February 26, 2003, the plaintiff contended that "the following items of expenses were agreed by Northrop Grumman to be owed Mr. O'Toole shortly after they were incurred in 1996 but were not paid until August, 2001. Among those incurred costs in 1996 was the sum of $11,000 lump sum purchase assistance for a house in Los Alamos. That item was not incurred until September of 1998 when plaintiff purchased and moved into a home in Los

Alamos, and at that time was determined to be $11,500. This amount was included in the settlement of June 19, 2001.

The lump sum purchase assistance for the house in Los Alamos was not due until he purchased that house (Exhibit 15, Section II(C)). That provision provides that the reimbursement for home purchase assistance is limited to five per cent (5%) of the purchase price of the new home, and documentation must be provided substantiating the cost. Thus, in 1996, the only costs which were required to be reimbursed at that time amounted to $15,230. The plaintiff withdrew from his savings investment plan the sum of $43,000 in 1996, claiming that these withdrawals were necessary because the defendant had not paid plaintiff the relocation costs which were due to him. The Court finds that the taxes and penalties incurred by the plaintiff on the portion of the $43,000 withdrawal necessary to cover these relocation costs are recoverable as consequential damages. Using plaintiff's Exhibit 5, the Court finds that the penalties and taxes amount to 51% of the withdrawal or the sum of $15,540, which plaintiff is entitled to recover, together with interest at the legal rate from June of 1996 to date.

In 1998 when plaintiff purchased his home in Los Alamos, the defendant determined to pay him the 5% of purchase price as provided in Exhibit 12-15, Section II(C). This amounted to $11,500. However, it was not paid until the settlement of

June, 1991, and plaintiff testified he had to again withdraw funds from his SIP to cover these costs when they were incurred. He withdrew $45,728, but only that portion needed to cover the $11,500 is a recoverable item of damage.

At trial, Rita Ponte, one of defendant's witnesses, testified that she had discovered an error in calculating plaintiff's duplicate housing payments, which had been the subject of the settlement agreement in June. She testified (Tr. 397-98) that plaintiff was entitled to an additional $1,500. While it might be argued that such a claim has been extinguished by the settlement agreement, the Court finds that defendant has conceded that plaintiff should receive this sum.

Using the same formula as with the 1996 withdrawal, the Court finds plaintiff is entitled to $13,400.00, together with interest at the legal rate from October 1, 1998, to date.

### LOSS OF MORTGAGE INTEREST DEDUCTION

In a footnote to its opinion, the Court of Appeals stated:

> While the finding that Mr. O'Toole was not going to purchase a house for approximately a year would preclude consequential damages related to the loss of a reduction in taxes because of mortgage-interest deduction for that year, such preclusion would not affect tax losses suffered in subsequent years until Grumman finally paid the money it admitted it owned, and Mr. O'Toole could purchase a house.

The record reflects that Mr. O'Toole purchased a house in September of 1998. Commencing at that time, he would again have available to him a mortgage interest deduction for his taxes. The Court finds that the period of time during which he did not have available to him a mortgage interest tax deduction would commence approximately on July 1, 1997, which would be one year after he moved his family from San Diego to Los Alamos. Thus, he has lost a mortgage interest tax deduction from July 1, 1997, through September of 1998, or a period of fifteen months.

The Court is satisfied that plaintiff has sustained some damage by way of having to pay more income tax than he otherwise would have paid commencing in mid-1997. However, it is virtually impossible to calculate the amount of that damage for following reasons. In his 1998 tax return (Exhibit 6), he did not itemize his deductions but took only a standard deduction of $7,100. Thus, we do not know what deductions he may have had applicable to his 1998 tax return if he had a mortgage interest deduction to include in that return. The Court does not have available the tax return for the calendar year 1997 in order to determine what, if any, deductions he claimed for that year. Under these circumstances, the Court concludes it would be speculation to calculate what, if any, additional taxes he paid for either calendar year 1997 or calendar year 1998 for the roughly fifteen month period of time for which he would have been

eligible to take such a deduction, had he purchased a house in 1997 as was originally contemplated. The other consequential damage claim he might have in connection with the one year delay after June of 1997 would be the increase in equity that he would have built up during that time, had he been able to purchase a house at the end of the one-year period. At the most, this would amount to $2,000 or less (See Exhibit 15 which reflects a breakdown of payments in the year 2003). The Court will award this amount without prejudgment interest.

### VACATION PAY AND MOVING COSTS

Plaintiff claims $10,814 for moving costs incurred in moving into the second and third rental properties in Los Alamos. However, the plaintiff never paid this amount to anyone. This merely represents his doubling a bid which he obtained from a moving company for one of his interim moves. In addition, he seeks $2,350 for lost vacation time, but there is no record that he lost any vacation. It should be kept in mind that he made his second move in September of 1997 -- some four plus months after his employment with Northrop Grumman had ended. The move from the second to the third rental property occurred in May of 1998, which is more than a year after the termination of his employment with Northrop Grumman. There is no evidence that he was unable to buy a house in 1997 after the one-year term of his self-imposed rental period had ended. He certainly cannot claim as a

consequential expense an item representing bids by a moving company which expense he never incurred or paid. As to his claim for lost vacation, the only record available is Exhibit 4, and it does not reflect that he lost any vacation time when he made the move from his third rental property into the home which he purchased (Exhibit 4, Tr. 282). Since there is no evidence to establish that he sustained this type of damage as a result of the actions of Northrop Grumman, this claim will be denied.[1]

### MISCELLANEOUS EXPENSE OF $1,000

The Northrop Grumman field assignment policy provided for the payment of incidental expenses in connection with moves by an employee. The original policy (Exhibit 12.7) provides that the first $1,000 will be paid without the necessity of providing receipts, but any amount in excess of that $1,000 will only be paid if they are reasonable and if the employee submits receipts supporting those expenses. The field assignment policy (Exhibit 12.8) which was an update of Exhibit 12.7, provides for a maximum of $2,000 incidental expense, $1,000 of which would be paid without receipts, but the second $1,000 would be available only if plaintiff establishes that they were reasonable and provides

---

[1] Plaintiff has claimed that each of the two interim moves cost him $1,200 out of pocket. However, he offered no receipts or documents of any kind to substantiate this claim. The Court further notes that no such amount is mentioned in the pretrial order signed February 24, 2003, and filed February 26, 2003. The only claim included in the pretrial order is the $10,814 claim which he never incurred.

-12-

receipts establishing that he in fact paid such additional expenses. Under either policy, he is not entitled to recover this additional $1,000 as he admits that he did not submit any receipts to verify that he had incurred any expenses in excess of $1,000. (See Tr. 288-289). Accordingly, this claim will be denied.

### PAYMENT AT 14% FOR COST OF SELLING CURRENT LOS ALAMOS HOME TO PURCHASE SIZE OF HOME PLAINTIFF CONTENDS HE WOULD HAVE PURCHASED IF THE RELOCATION WAS HANDLED DIFFERENTLY. THE PAYMENT OF STANDARD AMOUNT OF 5% AS REIMBURSED FOR COSTS OF PURCHASING SECOND HOME IN LOS ALAMOS.

This claim is so speculative that it hardly deserves discussion by the Court. The Court is unable to find any evidence in the record to support this as a fact of damage other than the reference that any such claim being made by the plaintiff was excluded from the settlement of June 19, 2001. He also claims that he should receive 5% of the purchase cost to cover purchase expenses per the relocation policy. This hypothetical house has never been purchased and the record in this case is devoid of any relevant evidence to support his claim. The Court finds that this claim should be denied.

### LOST EARNINGS FROM EMPLOYMENT INVESTMENT FUND DUE TO WITHDRAWAL

This claim is premised on the assumption that if defendant had paid the relocation costs when due, plaintiff would not have needed to withdraw money from his SIP at Northrop

Grumman. However, the amounts he withdrew amount to twice the amount he needed to cover the withheld costs. In addition, he was earning approximately $100,000 a year during this period. With all of the expenses other than relocation, that he was facing, he would have most certainly had to withdraw funds from his SIP. In addition, the exhibit which he has provided to the Court (Exhibit 11) sets forth the earnings on the Northrop Grumman fund for the period from 1990 through 1999 (See 4th page of the exhibit). In some of the early 1990's, the Northrop Grumman fund had a positive return with a couple negative or very small positive returns. Considering the years beginning 1996 to 1999 can be seen that while the fund had a growth in 1996 and 1997, it was substantially lower in 1998, and had a 35.8% loss in 1999, and there are no records to show how the fund did after that date.

It is sheer speculation to make any finding that this fund would have had a positive growth after 1999. There is no evidence to support his claim that the annual growth had been 24% for the years prior to 1999 and that it would grow at a rate of 12% per year after that date, as he claims. This claim needs to be supported by an analyses of the Northrop Grumman funds for all of the years in question before any rational decision could be made with respect to whether or not plaintiff has in fact

sustained any damages for that loss of growth. For this reason, this claim will be denied.

## OTHER CLAIMS

Plaintiff also claims damages associated with the defendant's failure to recall him. However, the evidence in this record reflects that his income continued to grow during the years after his termination by Northrop Grumman, and no evidence has been presented to establish that he has sustained any losses by reason of their failure to recall him. He also claims damages associated with Northrop Grumman's failure to follow its grievance procedures. Such damages, if any, would have been no different than those which the Court has already discussed and resolved. As a separate claim, it will be denied.

Finally, he claims gross up on consequential damages. However, the plaintiff has admitted that he is not entitled to recover gross up on consequential damages (Tr. 319), and the parties have stipulated in their settlement agreement that the damages which the Court has addressed in this opinion are all consequential damages. This claim will be denied.

## CONCLUSION

The Court has calculated an annual interest rate for each of the years from 1996 to 2005 by reference to the Federal Reserve rates used for determining interest on judgments which were compounded annually, the Court finds that judgment should be entered for the plaintiff in the total amount of $31,970.00,

together with interest at the legal rate from and after the date of the filing of this judgment and the costs of this action. A separate order will be entered in accordance with this memorandum opinion.

DATED this 20th day of May, 2005.

BY THE COURT:

/s/ Lyle E. Strom
LYLE E. STROM, Senior Judge
United States District Court